**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Jul 26, 2023

| | |
|---|---|
| IN RE:<br><br>**WILMER AMNIEL MEDINA,**<br><br>       **Debtor.** | **Case No. 21-10320-M**<br>**Chapter 7** |
| **ILENE J. LASHINSKY, UNITED STATES TRUSTEE,**<br><br>       **Plaintiff,**<br><br>v.<br><br>**WILMER AMNIEL MEDINA,**<br><br>       **Defendant.** | **Adv. No. 21-01034-M** |

### MEMORANDUM OPINION

"Follow the money."[1] A key concept in politics, life, and bankruptcy. In order to properly administer a Chapter 7 bankruptcy case, a trustee must be able to locate and liquidate non-exempt assets for the benefit of creditors. If creditors wish to share in the distribution, they must file claims establishing the amount of money the debtor owes them. And, to obtain a discharge, a debtor must present an accurate financial history and enough financial information to allow creditors to understand where the money went and for the trustee to do their job, i.e., find the available assets and, if those assets no longer exist, determine their destiny. In addition to reviewing the bankruptcy schedules, it is often necessary for a trustee and/or creditors to examine the records of the debtor and/or the records of their business operations.

---

[1] *All the President's Men* (Warner Bros. Pictures 1976).

In this case, the debtor ran a business, entrusting the records to his aunt, the woman who raised him from childhood, and to whom he gave blind allegiance. The debtor, the aunt, and a lot of other family members treated the business as their own personal ATM, with the result that hundreds of thousands, if not millions, of dollars remain unaccounted for to this day. The debtor claims to have no access to the records of his businesses because the aunt will not surrender them. The most interesting plot twist is that debtor's aunt was a self-confessed embezzler, the debtor knew it, and yet he continued to entrust her with his money and the keeping of his books and records.

This is an action to deny the debtor his discharge because he cannot produce the books and records which are necessary to allow interested parties to "follow the money," nor can he explain where the money went. His primary defense lays the failure to produce records at the feet of his aunt. The question is whether a debtor may delegate his duty of record keeping to a known thief without consequence. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.[2]

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). The decision whether to grant or deny a discharge is a "core" proceeding as defined by 28 U.S.C. § 157(b)(2)(J).

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

### Findings of Fact

This is a tale of two families who have one person in common – Wilmer Medina ("Medina"), the defendant in this adversary proceeding. Medina is estranged from, yet still married to, Yadira Medina ("Yadira"), with whom he has four children, two of which, daughters Alisha Medina ("Alisha") and Joyce Medina ("Joyce") are relevant to this case. Medina currently lives with and is engaged to Cassie Swift ("Swift"), with whom he also has four children. Medina has other family members who were involved in his business operations, most notably Adelina Simpson ("Adelina"), his aunt. Adelina raised Medina from childhood. In many ways Medina considers Adelina to be his mother.

Medina is not well educated but has significant experience in the business of auto and recreational vehicle ("RVs") sales. From 2010 to 2014, Medina was a car salesman for an entity known only to the Court as AutoNation. In 2014, Medina and Swift moved to Oklahoma, and Medina began to work at Tulsa RV as its insurance manager. In 2015, Medina left Tulsa RV and teamed up with Bobby and Tony Mitchell to form RV Outlet Center ("RVOC"). Medina considered himself to be a 30% owner of RVOC, and, during his tenure there, earned between $30,000 and $50,000 per month. Medina was responsible for the day-to-day operations of RVOC and employed several of his family members during his tenure. Adelina served as RVOC's controller. Adelina's daughter Yudeily was employed as "BDC."[3] Medina's sister Jhoanna Subira worked for RVOC in the "internet department." Swift was employed as a "product specialist."

For our purposes, things at RVOC moved along uneventfully and profitably until Bobby and Tony Mitchell discovered that something was amiss with the books and records of RVOC.

---

[3] The Court is not certain what "BDC" stands for although, given later testimony, it likely relates to something known as a "business development center."

3

Specifically, they discovered that Adelina had been stealing money from the company by issuing duplicate payroll checks, using one legitimately, and taking the other for her own personal use. Yudeily participated in the scheme, which netted Adelina more than $40,000. Adelina admitted the theft, and both she and Yudeily were fired. Adelina repaid some $20,000 of her ill-gotten gains. Medina knew about the theft almost immediately after it was discovered, and heard Adelina confess to the embezzlement.

Some time after Adelina's termination, and partially due to Adelina's termination, Medina left RVOC and formed WAM Nation, LLC ("WAM Nation") to engage in the sale of recreational vehicles in the Tulsa area. WAM Nation is an Oklahoma limited liability corporation. Medina is its single member and manager. According to Medina, "WAM Nation is just me." WAM Nation is a passthrough entity under corporate and tax law; any income of WAM Nation not offset by legitimate business expenses is personal income of Medina.[4] Based upon the records before the Court, WAM Nation generated significant revenues. According to its tax returns, WAM Nation had gross sales of $2,729,358 in 2018 and $4,943,520 in 2019.[5] A profit and loss statement prepared for WAM Nation for January through December 2020 shows gross sales of $4,033,433.57.[6] Adding these amounts together would indicate that WAM Nation had over $11.5 million in gross sales in the three years prior to the filing of Medina's bankruptcy case.

One of the first things Medina did upon the formation of WAM Nation was to hire Adelina, who was placed in control of the business records of WAM Nation without restriction or control. In fact, at all times relevant hereto, with one minor exception to be discussed *infra*, Adelina was the ***only*** person with access to the books and records of WAM Nation, which were maintained in

---

[4] Pretrial Order, Docket No. 12 § II(C)(10).
[5] *Id.* § II(C)(13), (17).
[6] *Id.* § II(C)(27).

password-secured computer files. Medina did not secure any passwords for himself; nor did he take steps to make sure that a backup copy of the records was maintained or accessible. Moreover, Adelina handled all the income of WAM Nation; virtually every dollar received was placed under her control. The Court wishes to emphasize that, at the time Medina hired Adelina to work at WAM Nation and gave her full and absolute control over its (and effectively his own) finances, he did so with full knowledge that she had stolen money from and falsified the books and records of RVOC. His explanation was that he did so to keep peace in the family. Not only did he hire Adelina, he also hired Yudeily to run the service department, potentially putting these two embezzlers back in business.

Medina's employment largesse continued with WAM Nation. Alicia was given the job of running the business development center, while Joyce became WAM Nation's receptionist. Jhoanna Subira worked with the internet, managing WAM Nation's website. Medina's wife Yadira worked with titles for the RVs. Swift worked in customer service, "help[ing] in signing the customers." Another "employee" ostensibly working for WAM Nation in the title department was Samuel Simpson Herrera, Medina's uncle ("Herrera"). Medina admitted that, although WAM Nation paid Herrera some $1,000 per week, Herrera did little or no work.

Medina's munificence was not confined to providing jobs for his family. He has admitted that he "is a member of a close knit family who regularly helps his family members financially. In the last two years he has habitually supported family members by paying their vehicle payments, paying utilities, paying rent payments, or providing them small cash gifts."[7] Medina was unable to quantify the amounts taken by family members, how the amounts were calculated, or their

---

[7] UST Exh. 2-7.

purpose.[8] It appears that Medina and members of his family used the financial resources of WAM

Nation as their own personal piggy banks. On one of the WAM Nation accounts, Medina, Adelina,

_____

[8] Although the trial transcript is replete with examples, one will suffice:

Q. [Mary Kindelt, Office of United States Trustee] Okay. Let's go back to page 6 of this exhibit. So let's go to 16-B-6, please. And do you see the second from the bottom on the left there's a check 1002 to Yudeily Simpson? Do you see that, sir?

A [Medina]. Yes.

Q. Okay. First I'd like to ask you -- it appears to me that on this page there are four checks numbered 1002. Do you know why there are so many checks there with the same number?

A. No. No idea.

Q. Okay. Let's specifically look at that check to Yudeily. It looks like it's March 16th of 2020 for $12,000. Do you see that?

A. Yes, ma'am.

Q. Do you know what that's for?

A. No, ma'am.

Q. Are there any documents in your possession that could help us figure that out?

A. No, ma'am.

Q. Let's go to 16-B, page 39, please.

A. 39?

Q. 39, yes, sir. Do you see the top left check, check number 1058 to Yudeily Simpson?

A. Yes, ma'am.

Q. Okay. And that is April 10th, 2020, in the amount of $8,000?

A. Yes.

Q. Do you know what that check is for?

A. No, ma'am.

and Swift were all provided debit cards that could be used for any purpose, business or personal. The bank records received into evidence show that these cards were used for a variety of non-business expenses, such as fast food, beauty supplies, martial arts training, wigs, and body waxing.

The business records that were presented to the Court regarding WAM Nation created far more questions than answers. A few examples prove the point.[9] In its Statement of Profit and Loss for the year ending December 31, 2019, WAM Nation listed "Other Expenses" of $552,820.[10] Medina could not explain any of the expenses included in this amount. In its Statement of Profit and Loss for the year ending December 31, 2020, WAM Nation listed "bad debts" of $2,056,388.27,[11] which is made even more interesting by the fact that the 2019 Statement of Profit and Loss did not list *any* bad debts. When questioned about the amount or the apparent

---

Q. Okay. Do you have any records in your possession that we could figure that out?

A. No.

Q. Okay. So we saw a check to Yudeily for $12,000 March 16th, and we see a check to Yudeily for $8,000 in April. Over a two-week period, she is paid $20,000; correct?

A. Yes, ma'am.

Q. And we don't know why?

A. No, ma'am.

Q. Okay. And is there any way to figure that out?

A. No.

Trial Tr.  vol. 1, Docket No. 19, 107:25 – 109:13. The trial transcript is replete with additional examples.

[9] To be clear, these examples are illustrative, not exhaustive. Any attempt at an exhaustive review of the inconsistencies and deficiencies in the financial information related to WAM Nation would turn this memorandum opinion into a novella.

[10] UST Exh. 9.

[11] UST Exh. 15.

discrepancy, Medina testified that he "had no idea" where any of these numbers came from. In addition, Medina testified that he was not aware of any receipts or other supporting documentation to explain the numbers in these (or any other) financial statements prepared with respect to WAM Nation.

Turning our focus to the $2,056,388.27 in bad debts, the Court heard testimony from Clara Mericle, an employee of the Office of the United States Trustee ("UST") and a Certified Public Accountant, to the effect that the $2,056,388.27 number was unexplainable. Ms. Mericle reached that conclusion by noting that the balance sheet of WAM Nation as of June 30, 2020, showed accounts receivable of approximately $176,000.[12] She next noted that the net sales of WAM Nation for the period between July 1, 2020, and December 31, 2020, were approximately $1,400,000. Therefore, reasoned Ms. Mericle, even if WAM Nation made every sale in the last half of 2020 on 100% credit and collected none of the $176,000 in accounts receivable owing as of June 30, 2020, the total bad debt could not reach the $2,056,388.27 number.

The same level of financial confusion is present in Medina's personal tax returns. For example, on May 14, 2019, Medina filed his 2018 federal income tax return showing an adjusted gross income of $175,928.[13] Some three months later, an amended 2018 federal income tax return was prepared for Medina showing an adjusted gross income of $766,252, reflecting an increase in income of almost $600,000.[14] Medina could not explain or substantiate any of the numbers in either tax return, and could not identify the reason for the amended return.[15] Medina's 2019 tax

---

[12] Id.

[13] UST Exh. 10-2.

[14] UST Exh. 11.

[15] The only reason of record for preparation of the amended return is found in the amended return itself: "Client contacted us on 8/17/19 stating that he was pre-approved for a business bank loan. Client states he needs to make minor adjustments to his 2018 tax return to validate the profit &

return, prepared in August 2020, shows an adjusted gross income of $216,051.[16] He has yet to file

tax returns for 2020 or 2021.

A review of Medina's personal checking account (the "Arvest 0672 Account") reveals over

$300,000 in unaccounted for withdrawals between February 10, 2020, and January 25, 2021.[17]

These withdrawals are all noted on the bank statements as a "Priority Check," with no listing of

any payee. When Medina was questioned about the last such Priority Check, issued January 25,

2021, for $7,000, he had no idea what it was for and admitted he that he lacked the records or the

ability to determine the nature or purpose of the withdrawal. In addition, there are almost $500,000

in uncategorized deposits during the same time period, which Medina stated were moneys

generated by the business operations of WAM Nation. Medina admitted he "utilized WAM Nation,

LLC bank accounts to pay personal bills, which at times amounted to $15,000 per month."[18] The

intermingling of the personal finances of Medina and the finances of WAM Nation give credence

to Medina's simple and straightforward admission that "WAM Nation is just me."

Medina was unable to tell the Court much of anything about his own financial history or

the financial history of WAM Nation. He wishes to lay all responsibility for his ignorance at

Adelina's feet, as Medina left all the books and records in Adelina's custody and control. Those

records were kept and stored electronically using the Microsoft Excel spreadsheet program, and

---

loss of business RV Travel Nation. Client advised." *Id.* at 11-4. Rarely has this Court seen a 400%
increase in personal income characterized as a "minor adjustment."
[16] Debtor's Exh. 103.
[17] UST Exh. 20-3. This is a page from a summary exhibit prepared by Ms. Mericle and is based
upon her review of the Arvest 0672 Account. UST Exhibit 17. The Court has independently
reviewed the records of the Arvest 0672 Account to verify the transactions contained in the
summary exhibit.
[18] Pretrial Order, Docket No. 12 § II(C)(32).

only Adelina had the ability to access them. All these records were password protected, and Adelina was the only person with the passwords.

In early 2020, as the Covid-19 pandemic loomed, Medina for the first time questioned the business numbers provided by Adelina. In an effort to check the figures given to them by Adelina, Medina and Swift reviewed the "deal jackets" from WAM Nation for sales in 2019.[19] Apparently the numbers Medina arrived at based on the deal jackets did not reconcile with the sales numbers provided by Adelina. Medina questioned Adelina about the sales numbers, but nothing conclusive happened, and Adelina remained in exclusive control of the finances of WAM Nation. Swift was given the necessary password to access the records of WAM Nation for a very short period, but Adelina quickly changed the password and blocked any further access for Swift or anyone else. Near the end of 2020, Medina hired four or five accountants to work for WAM Nation, hoping to gain a better understanding of WAM Nation's finances. Adelina prevented those accountants from doing any meaningful work, and ultimately fired them. At the time of trial, Adelina had left the state of Oklahoma, taking the computerized records relating to Medina and WAM Nation with her. Medina has made attempts to reach Adelina to retrieve those records and gain access to them, without success.

Medina filed a petition under Chapter 7 of the Bankruptcy Code with this Court on March 28, 2021. Steven W. Soulé ("Soulé") was appointed to serve as trustee. While investigating Medina's financial affairs, Soulé requested that Medina provide him with bank account records and amend his statement of financial affairs to accurately list his income and gifts to family members. In response, on May 20, 2021, counsel for Medina advised Soulé as follows:

---

[19] A "deal jacket" is a folder containing the documents related to the sale or servicing of a specific recreational vehicle (bill of sale, title, financing agreement, etc.).

I just don't know how soon Debtor will be able to amend SOFA to show gifts in detail or income in detail without some sort of forensic accounting- the accounts and transfers are so convoluted that likely won't be possible until an accountant looks at everything. The Debtor's aunt used to take care of the accounting but there is a family falling out, so that getting that information won't be possible anytime soon. FYI.[20]

On October 7, 2021, Soulé and the UST conducted a Rule 2004 examination of Medina that lasted more than three hours.[21] In that examination, Medina was questioned extensively about his business and personal finances. After that examination, the UST requested that Medina provide information relating to his tax returns, real estate purchases, copies of bank statements, as well as any documentation Medina had previously supplied to Soulé. The UST deemed the information provided to be insufficient to allow for an understanding of Medina's financial affairs.

This adversary proceeding seeking to deny Medina a discharge was filed by the UST on December 22, 2021. The UST undertook written and deposition discovery in this case, with limited success.[22] In an attempt to comply with a subpoena issued by the UST, Medina/WAM Nation

---

[20] UST Exh. 16A (email exchange between Soulé and counsel for Medina).
[21] UST Exh. 3.
[22] Ms. Mericle provided this uncontradicted testimony regarding those efforts:

> Q. [Mary Kindelt, UST] Did you or your office request any documents from the debtor in discovery once this adversary was filed?
>
> A. [Ms. Mericle] Yes.
>
> Q. And what did you request and what did you receive in response?
>
> A. In the discovery, again, we asked for tax return – copies of tax returns and all the supporting documents for those tax returns for 2019 forward. We asked for all -- or for bank statements for all individual accounts, all business accounts, basically all information we could think of to try to get a good picture of the financial transactions and how much income the business had and try to get to a number that would be attributable to Mr. Medina's personal income.
>
> Q. So what did you get in response to those discovery requests?

provided the UST with twelve boxes of documents.[23] The documents in these boxes were assembled by Swift. The boxes were not offered into evidence, nor does the Court have a full understanding of what was in them. In addition, the UST deposed Medina yet again, the deposition lasting approximately five hours.[24]

Swift also prepared a spreadsheet in which she attempted to summarize all payments made from the Medina and WAM Nation bank accounts to members of Medina's family.[25] Admittedly, Swift did not have all the information needed to allocate payments with precision and extrapolated

---

A. Basically, what we had gotten prior to the complaint in addition to -- we got the same bank statements that we had received previously. We did get a balance sheet and a couple of P&L statements for WAM Nation. That's basically it out of the discovery requests.

Q. Did you or your office subpoena documents from WAM Nation, LLC, in this adversary proceeding?

A. Yes.

Q. And what documents were subpoenaed?

A. We subpoenaed all -- basically, all financial records as well as corporate records for WAM Nation from January of 2018 forward.

Q. And what documents did you receive in response?

A. To the subpoena?

Q. Yes.

A. Twelve boxes of records.

Trial Tr. vol 1, Docket No. 19, 193:19 – 194:24.
[23] Debtor's Exh. 116. This exhibit is a photograph of the boxes provided. In the photograph, there appear to be eight large boxes, and four smaller boxes.
[24] UST Exh. 5.
[25] Debtor's Exh. 115.

the allocation of some expenses based upon her experience.[26] Upon cross-examination, several questions and inaccuracies in Swift's allocation were exposed. A few examples will suffice. One of the bank accounts reviewed by Swift and in the name of WAM Nation contained a July 3, 2020, withdrawal slip in the amount of $24,092.72, with the notation "IRS."[27] Swift testified that she understood this to mean the "International Revenue Service." The Court assumes she misspoke and meant to refer to the Internal Revenue Service. However, in her spreadsheet, Swift classified this withdrawal as "costs of goods sold – inventory."[28] She was unable to explain her basis for that classification. As another example, Swift allocated approximately $125,000 for the purchase of a 20-year-old fifth wheel by a Rick and Amy Parker.[29] She was unable to identify the unit allegedly purchased or explain why a 20-year-old recreational vehicle would bring such a high price. In addition, Swift classified what appear to be loans to WAM Nation from the Small Business Administration as sales of inventory.[30] While Swift's effort is admirable, it is not reliable. Swift has no formal education in accounting or bookkeeping and is unqualified to engage in the process of forensic accounting. Her work casts no real light on where Medina's or WAM Nation's money has gone.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

---

[26] For example, with respect to payments shown on bank statements to Walmart, Swift allocated those payments to family members or as business expenses based upon the location of the Walmart. Trial Tr. vol. 2, Docket No. 20, 25:17 – 26:14.

[27] UST Exh. 16B, at 71.

[28] Debtor's Exh. 115, at 52.

[29] Trial Tr. vol. 2, Docket No. 20, 51:4 – 58:4.

[30] *Id.*, 59:5 – 59:22. Again, these examples are illustrative, not exhaustive.

## Burden of Proof

In this adversary proceeding, the UST asks the Court to deny Medina a discharge pursuant to § 727(a)(3) and (5) of the Bankruptcy Code.  To prevail under these sections, the UST must prove each statutory element by a preponderance of the evidence.[31]  As the Bankruptcy Appellate Panel for the Tenth Circuit has held,

> A prima facie case under § 727(a)(3) requires a showing that a debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his [or her] financial condition and *material* business transactions." If a creditor or trustee meets this initial burden, "the burden then shifts to the debtor to justify his or her failure to maintain the records." A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss of assets occurred. The burden then shifts to the debtor to explain the loss of assets in a satisfactory manner. The ultimate burden under § 727 rests with the plaintiff and must be proven by a preponderance of the evidence.[32]

To further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[33]  Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[34]

## Conclusions of Law

### Section 727(a)(3)

Section 727(a)(3) provides that

> The court shall grant the debtor a discharge, unless—

> . . . .

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might

---

[31] Fed. R. Bankr. P. 4005. *See also Grogan v. Garner*, 498 U.S. 279 (1991): *First Nat'l Bank v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991).

[32] *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 189 (10th Cir. BAP 2017) (footnotes omitted).

[33] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[34] *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.][35]

This Court has previously held that "[t]he decision as to whether the books and records provided are sufficient is to be made on a case-by-case basis, and is a matter left to the discretion of the bankruptcy court."[36] A party seeking to deny the debtor a discharge under § 727(a)(3) need not prove fraud or the intent to conceal assets.[37]

Once again, *Martinez v. Sears (In re Sears)* provides the Court with valuable guidance:

> "The scope of the debtor's duty to maintain records depends on the nature of the debtor's business and the facts and circumstances of each case." When a debtor carries on a business involving substantial assets, "greater and better record keeping" is warranted. Other circuit courts and bankruptcy courts hold that records are inadequate where the debtor failed to separate personal and business accounts, failed to substantiate expenses, or failed to explain dispositions of cash.[38]

In this circuit, denial of discharge under § 727(a)(3) requires proof of the failure to maintain adequate records and proof that the failure makes it "*impossible* to ascertain [a debtor's] financial condition and *material business* transactions."[39]

---

[35] § 727(a)(3).

[36] *Okla. DHS v. Bryan (In re Bryan)*, 612 B.R. 618, 625 (Bankr. N.D. Okla. 2020).

[37] *Solis v. Asif (In re Asif)*, 455 B.R. 768, 790 (Bankr. D. Kan. 2011).

[38] 565 B.R. 184, 189-90 (footnotes omitted) ((quoting *Bailey v. Ogden (In re Ogden)*, No. UT-98-042, 251 B.R. 441, 1999 WL 282732, at *6 (10th Cir. BAP Apr. 30, 1999) (unpublished opinion) (§ 727(a)(3) inquiry is fact specific).  *See also Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 762 (9th Cir. 2008) (greater duty to keep records where debtor is engaged in substantial business); *In re Juzwiak*, 89 F.3d at 428 (checking account ledgers, canceled checks, bank statements, and income tax returns were insufficient to reconstruct a debtor's financial condition without the source of funds and substantiation of expenses when personal and business expenses were commingled); *Varco Pruden Bldgs. v. Strider (In re Kennington)*, 393 B.R. 430 (Bankr. N.D. Miss. 2008) (failure to maintain distinction between company finances and personal finances, using corporate funds to pay personal expenses, and failing to maintain corporate books making it impossible to verify business dealings resulted in inadequate financial records).

[39] *Gullickson v. Brown (In re Gullickson)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (citation omitted).

The facts in *In re Sears* are strikingly similar to the case at bar. Sears ran hunting and cattle businesses that generated millions of dollars. For several years, he had no personal bank accounts, choosing instead to have his companies pay his personal expenses. After Sears filed a chapter 7 bankruptcy in 2015, the trustee identified over $2.2 million in disbursements from debtor's companies to the debtor, his wife, and his son. The chapter 7 trustee was unable to determine how the money was ultimately spent, and all she received from the debtor was "a vague explanation that the funds were used for personal or business expenses, for which he offered no documentary support."[40] Although Sears attempted to reconstruct his financial records, his attempts "were neither accurate nor complete."[41] As a result, the bankruptcy court denied Sears a discharge. The Bankruptcy Appellate Panel of the Tenth Circuit, in an opinion authored by this judge, affirmed.

Here, Medina hopelessly commingled his finances with the finances of WAM Nation. He admitted spending thousands of dollars a month out of WAM Nation accounts for his own personal use. The evidence establishes that he deposited WAM Nation revenues directly into his own personal account. His wife, his fiancé, his aunt, his children, and others took money from the WAM Nation account like a kid takes cookies from a jar. There are hundreds of thousands of dollars of withdrawals that remain unaccounted for, and Medina admitted under oath that he had no idea whether any of the financial information presented to the Court was accurate, or where much of the money went.

Medina argues that he has complied with § 727(a)(3), relying upon the twelve boxes of documents, the numerous bank statements, the various "deal jackets" of sales and service transactions, and finally the summaries prepared by Swift. Medina's counsel argues that "[t]here

---

[40] *In re Sears*, 565 B.R. at 188.
[41] *Id.* at 190.

was certainly enough there for the panel trustee and the UST to ask intelligent questions based on the documents provided."[42] The issue is not whether the UST could ask intelligent questions, but whether Medina or his documents could provide intelligent answers. When the UST attempted to question Medina about his finances at trial, his most common response was "I don't know." The exhibits submitted at trial were no better, as they were shown to be inaccurate, inconsistent, and incomplete. To the extent Medina suggests that it was incumbent upon the UST to conduct a forensic audit of the twelve boxes of documents he ultimately produced, the Court is not persuaded. No such duty exists.[43]

Medina also argues that, for the Court to consider the woeful inadequacy of the records of WAM Nation, the corporate veil between Medina and WAM Nation must be pierced. Medina argues that since the UST never asked for a formal piercing of the corporate veil, the Court is prohibited from making any decision based upon the inadequacy of the records of WAM Nation, even though Medina admits that "it may seem clear Debtor treated his business and his personal

---

[42] *Closing Argument by Wilmer Medina,* Docket No. 24, at 5.

[43] *See In re Sears*, 565 B.R. at 190 ("The Debtor makes another rather unique argument in support of his position that the requirements of § 727(a)(3) have not been met. Debtor argues that, under § 704(a)(4), a Chapter 7 trustee has a duty to 'investigate the financial affairs of the debtor.' Debtor contends that this duty required the Trustee to undertake a detailed review of all of the Debtor's records, depose the Debtor, the Debtor's bookkeeper, and the Debtor's accountant, and, finally, hire an expert should she deem it necessary in order to fully understand the financial affairs of the Debtor. Debtor argues that the Trustee's failure to undertake such herculean tasks precludes the filing of a complaint under § 727(a)(3) and the resultant denial of his discharge. The Debtor offers no viable legal precedent in support of this argument. Perhaps it is because none exists.") (footnotes omitted)); *Hunt v. Steffensen (In re Steffensen)*, 534 B.R. 180, 203 (Bankr. D. Utah 2015) ("[W]hat the photographs of boxes and file cabinets depict is a mass of documents, which a trustee, creditor, or court is not required to sift through in order to reconstruct a debtor's financial condition. . . . A debtor's records are not satisfactory if a trustee, creditor, or court would have to undertake a 'time consuming and detailed analysis' of bank statements, canceled checks, receipts, and the like in order to determine the debtor's financial condition.") (footnote omitted), *aff'd,* 567 B.R. 188 (D. Utah 2016); *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 187 (Bankr. S.D. Ohio 2022) ("[T]he Code requires more from a debtor than the proverbial document dump. The debtor should provide organized records of his financial affairs and business dealings.").

finances interchangeably[.]"[44] Medina offers no authority for this position, other than to state that the laws of Oklahoma require WAM Nation to be recognized as a separate legal entity. There is no doubt that, in determining whether to deny a debtor a discharge under § 727(a)(3), "if corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)."[45] The only thing conclusively established by the record in this case is that Medina and his family had no regard for corporate formalities or the idea that WAM Nation was a separate legal entity. Income and expenses were hopelessly commingled, and massively unaccounted for. The suggestion that Medina can hide behind a corporate wall at this stage is not well taken.

The Court candidly admits that, after hearing the testimony and reviewing the exhibits submitted, it has no idea as to the true financial position of Medina or WAM Nation and absolutely no faith in the accuracy of any of the balance sheets, income statements, tax returns, or attempted financial reconciliations submitted in this adversary proceeding. While no one disputes the accuracy of the bank records, they are of little assistance because of the sheer number of deposits and withdrawals listed without identifying the source of funds deposited, or the payee of funds disbursed. Medina admits that "it is hard to understand where RV sales proceeds were spent and what creditors were paid."[46] The Court disagrees as to the severity of the problem: It is not difficult

---

[44] *Closing Argument by Wilmer Medina,* Docket No. 24, at 12. For the record, this fact doesn't just "seem" clear, it *is* clear, having been established by overwhelming and uncontroverted evidence.

[45] *Solis v. Asif (In re Asif)*, 455 B.R. 768, 792 (Bankr. D. Kan. 2011) (internal quotation omitted); *see also Lee v. Peeples (In re Peeples)*, 779 Fed. Appx. 561, 566 (10th Cir. 2019); *In re Steffensen*, 534 B.R. at 202 ("[A] 'lack of business records relating to a company substantially intertwined with a debtor may provide the basis for the denial of a debtor's individual discharge under § 727(a)(3).'") (quoting *U.S. Trustee v. Kandel (In re Kandel)*, No. 11-62597, 2015 WL 1207014, at *8 (Bankr. N.D. Ohio Mar. 13, 2015)). The Court could continue this string of citations *ad nauseum*, but the point has been made.

[46] *Closing Argument by Wilmer Medina*, Docket No. 24, at 5.

to understand how the money was spent—it is impossible. The standards for denial of discharge under § 727(a)(3), even under the stringent standard espoused in *Gullickson v. Brown (In re Brown)*, have been met in this case.

The next question is whether the failure to keep adequate books and records is "justified under all of the circumstances of the case[.]"[47] Medina's primary argument on this point is that he trusted Adelina to manage his finances and care for his money, that she has betrayed that trust, and is (for lack of a better term) holding his books and records hostage. The operative question is not whether Adelina has sole access to the records she prepared in the course of her employment at WAM Nation, or even whether her refusal to surrender them at this point is reasonable. The question is whether these "circumstances of the case" justify Medina's failure to keep sufficient records from which his business and financial affairs may be determined or, put another way, whether Medina's total surrender of financial records to Adelina was even remotely reasonable.

From the moment Adelina began to manage the finances, the books, and the records of WAM Nation, Medina knew that she was an embezzler. He knew that during the course of her employment at RVOC, Adelina falsified records and issued duplicate checks in order to siphon funds from the business for her own personal use. And yet, armed with that knowledge, not only did Medina allow Adelina access to every dime generated by WAM Nation and to prepare all the books and records relating to the same, he gave her a stranglehold on those records, to the point where no one, including Medina, could even look at them, because ***no one except Adelina*** had the passwords to the computer records. Not only did Adelina have full control of all financial records, every dime that came into WAM Nation was at one time or another under her control. Medina's conduct defies logic and common sense. No reasonable person, regardless of education or

---

[47] § 727(a)(3).

experience, would have left a known thief in total control of millions of dollars. Courts have refused to excuse the failure to keep and maintain records where the records in question were in the hands of an accountant;[48] surely the excuse must fail where the records are knowingly placed in the hands of a thief.[49] Medina chose to turn a blind eye to the malfeasance of Adelina in order to preserve family harmony, but that choice does not obviate his duties as a debtor under the United States Bankruptcy Code.

The Court is aware that Medina has a limited education, and that education and business sophistication are factors to be considered under § 727(a)(3). While Medina's education may be limited, he has extensive experience in the RV industry, and has owned or operated multimillion dollar operations for years. Again, this case is like *In re Sears*, where both the bankruptcy court and Bankruptcy Appellate Panel noted that a minimal education, standing alone, did not justify a failure to maintain records.[50] In this case, we have an operation that, based on its books and records,

---

[48] *See, e.g., CM Temp. Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 418 n.3 (Bankr. S.D. Ohio 2007) ("To the extent the Debtor is arguing he is not responsible for producing business records simply because he employed an accountant, who was never an officer of Bailey Contracting, the court rejects this explanation as wholly inadequate under the requirements of § 727(a)(3).").

[49] The Court was unable to find any factually similar cases on this point. However, several courts have held that a discharge may be denied under § 727(a)(3) where the debtor, either actively or passively, allows a third party to destroy his books and records. *See, e.g., Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 375 (Bankr. S.D. Tex. 2005) (debtor failed to take steps to preserve records in office after defaulting on office lease; discharge denied); *Tucker v. Devine (In re Devine)*, 11 B.R. 487, 488 (Bankr. D. Mass. 1981) ("There inheres in the duty to produce records from which the Debtor's financial condition can be ascertained, the duty to take reasonable precautions for the preservation of these records.") (discharge denied where debtor allowed former landlord to destroy business records). If the failure to preserve records justifies the denial of a discharge, the entrustment of those records to a known embezzler cannot be far behind.

[50] *See Martinez v. Sears (In re Sears)*, 565 B.R. 184, 191 n.35 (10th Cir. BAP 2017) ("While other courts have held that a similar lack of formal education justified a failure to keep adequate records, in those cases the debtor's lack of education was combined with lack of business experience and a modest financial undertaking. *See, e.g., Floret, L.L.C. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 764 (8th Cir. BAP 2002) (debtor's poor education and lack of experience along with modest size of business justified lack of record keeping); *Johnson v. Greene (In re Greene)*, 340 B.R. 93

generated approximately $11 million in the three years prior to filing. An enterprise of that magnitude demands that meaningful books and records be kept.

Medina also makes the argument that Medina should not be denied a discharge because the UST failed to ask questions about his finances prior to trial, or, at a minimum, failed to ask the right questions. In the words of Medina's counsel, Medina "can't reasonably be required to respond to questions that were never asked."[51] The argument, made without citation to any legal authority lacks merit. As counsel for Medina notes in his closing argument, the UST questioned Medina extensively about his finances prior to trial of this adversary proceeding. The problem was that there were no meaningful answers given.[52] Medina was provided yet another opportunity at trial to produce records that would adequately explain his finances. He readily admitted that he could not do so. Even if, as argued by his counsel, Medina "answered all questions presented to him to the best of his ability,"[53] the statement is meaningless, because Medina had **no** ability to

---

(Bankr. M.D. Fla. 2006) (inadequate records justified when debtor received minimal income from odd jobs and lacked sophistication and business experience).").

[51] *Closing Argument by Wilmer Medina*, Docket No. 24, at 12.

[52] Medina and his counsel virtually admitted they lacked the ability to provide meaningful answers regarding Medina's income. Question 4 of the Statement of Financial Affairs requires a debtor to list his "income from employment or from operating a business during this year or the two previous calendar years." UST Exh. 1, at 157. Given that Medina filed his bankruptcy case on December 22, 2021, this would have required Medina to provide information regarding his income for 2019, 2020, and through December 22, 2021. He failed to do so, listing his income for 2020 and 2021 as "unknown," and claiming $216,051 as his income in 2019. Id. at 158. In response to a question from Soulé at the first meeting creditors, counsel for Medina admitted that no meaningful numbers could be provided absent a forensic accounting. Debtor's Exh. 125, at 66. There has been no forensic accounting, yet Medina was somehow able to file an amended statement of financial affairs listing income of $275,596.24 in 2020 and $21,009.83 in 2021. UST Exh. 2, at 2. However, Ms. Mericle testified that it was not possible to verify any of these numbers and that, in fact, financial information received from Medina with respect to his 2021 income was inconsistent with the number contained in the amended statement of financial affairs. Trial Tr. vol. 2, Docket No. 20, 199:18 – 201:14.

[53] *Closing Argument by Wilmer Medina*, Docket No. 24, at 12.

answer questions about his personal finances or the finances of the business whose affairs he allowed to be hopelessly intertwined with his own.

The records and testimony before the Court are woefully incomplete. The Court has no faith in any of the numbers contained in any of the financial records provided, and notes that many of them show the expenditure of hundreds of thousands of dollars without explanation. Medina has failed to comply with the duties imposed on all chapter 7 debtors by § 727(a)(3). He is not entitled to a discharge.

*Section 727(a)(5)*

Having determined that Medina is not entitled to a discharge under § 727(a)(3), the Court need not reach any issues under § 727(a)(5).

## Conclusion

Medina is not entitled to and shall not be granted a discharge in Case No. 21-10320-M. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 26th day of July, 2023.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

7837.3